# Exhibit A

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| CHUNECE JONES-BROADWAY, as<br>Administrator of the Estate of Michael Broadway, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. 1:24−cv−11700 |
| ILLINOIS DEPARTMENT OF CORRECTIONS, | ) ) | Judge Andrea R. Wood |
| WEXFORD HEALTH SOURCES, INC.,<br>CHARLES TRUITT, JERMIAGH DALY, | ) ) | Magistrate Judge Heather K.<br>McShain |
| BRITNEY HARVEY, AMELIA ARINAGA,<br>KENNETH NUSHARDT, MICHAEL BIRD, | ) ) | |
| PATRICK GAGLIARDO, ANTHONY GARANT,<br>SHANE LEIBY, JEFFERY LOVETT, JOHN | ) ) | **JURY TRIAL DEMANDED** |
| ANDERSON OROCK, RAYMOND PAHL,<br>EDWARD BERZINSKI, and JENNIFER | ) ) | |
| HENNING, | ) ) | |
| Defendants. | ) ) | |

## AMENDED COMPLAINT

Plaintiff Chunece Jones-Broadway, as Administrator of the Estate of Michael Broadway,

by and through her undersigned attorneys at Kaplan & Grady LLC, complains of Defendants

Illinois Department of Corrections, Wexford Health Sources, Inc., Charles Truitt, Jermiagh Daly,

Britney Harvey, Amelia Arinaga, Kenneth Nushardt, Michael Bird, Patrick Gagliardo, Anthony

Garant, Shane Leiby, Jeffery Lovett, John Anderson Orock, Raymond Pahl, Edward Berzinski, and

Jennifer Henning, and states as follows:

### INTRODUCTION

1.      This case is about Defendants' deliberate indifference to the life of Michael

Broadway, who died struggling to breathe in oppressively hot temperatures on the top floor of a

decrepit and unsafe housing complex at Stateville Correctional Center.

2.     Michael Broadway was a beloved father, husband, son, mentor, friend, scholar, and storyteller. He was known for his strong moral compass, his flawless comedic timing, and his willingness to offer a listening ear or wise advice, whichever was most needed in the moment. Michael was dedicated to his academic and professional success as an author. More than anything, however, he cherished his relationships with his family and large yet tight-knit community.

3.     Michael's tragic and painful death was the result of Defendants' cruelty and callous indifference. Defendants had full knowledge of the unsafe conditions at Stateville; Michael's asthma, which made those conditions particularly unsafe; and Michael's desperate need for emergency care. Instead of helping him, Defendants watched Michael slowly perish while gasping for breath.

4.     Defendant Charles Truitt, the warden of Stateville, and Defendant Jermiagh Daly, the prison's chief engineer, knew that the housing units at Stateville were dangerously hot. They knew that the windows were nailed shut and the fans were padlocked. Yet they took no action to mitigate the serious risk of harm to prisoners from the excessive heat and humidity. Nor did they take action to mitigate the particularly serious risks of high temperatures to prisoners like Michael who suffer from asthma and other medical conditions worsened by intense heat. Indeed, when Michael asked to be placed on a lower gallery to accommodate his asthma, employees of Defendant Illinois Department of Corrections denied his request.

5.     Numerous correctional officers and medical staff at Stateville knew that Michael was in great danger on the day of his death. On June 19, during a prolonged and intense heat wave, Michael started struggling to breathe. Defendants Britney Harvey, Amelia Arinaga, Kenneth Nushardt, Michael Bird, Patrick Gagliardo, Anthony Garant, Shane Leiby, Jeffery Lovett, John Anderson Orock, and Raymond Pahl were aware that Michael was in severe respiratory distress.

Yet despite their knowledge that Michael was gasping for air, Defendants took no meaningful action to ensure Michael received prompt medical attention.

6.     Defendants Jennifer Henning and Edward Berzinski also knew that Michael was in great danger and required medical care that they, as nurses, were specifically trained to provide. But when Defendant Henning, arrived at the building where Michael was fighting for his life, she initially refused to walk up the stairs to his cell because it was "too hot," and only trudged to his cell precious minutes later, with no medical equipment in hand. When Defendant Berzinski arrived at Michael's cell, he did not bring any equipment either.

7.     Michael is survived and cherished by his wife Plaintiff Chunece Jones-Broadway, his son Christopher, five young grandchildren, his dear 84-year-old mother, and many other family members and friends who miss him and his radiant smile. He was taken away from them just weeks before his 52nd birthday.

8.     Plaintiff brings this lawsuit to obtain a measure of accountability for the tragedy that befell Michael and to send a clear signal to Defendants that their blatant disregard to the rights and safety of incarcerated men and women will not be tolerated.

**JURISDICTION AND VENUE**

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 because this is an action arising under the Constitution and laws of the United States and because Plaintiff's state law claims are part of the same case or controversy as the federal claims over which the Court has original jurisdiction.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because on information and belief one or more Defendants reside in this District and because a substantial portion of the events giving rise to the claims asserted occurred in this District.

## PARTIES

11.     Plaintiff Chunece Jones-Broadway is the wife of Michael Broadway and the duly appointed Administrator of his Estate. The Estate of Michael Broadway was opened in the Probate Division of Cook County, Illinois.

12.     Defendant Wexford Health Sources, Inc. (Wexford) is a for-profit corporation headquartered in Pennsylvania transacting business in Illinois. Pursuant to a multi-billion-dollar contract with the State of Illinois, Wexford is the healthcare provider for IDOC prisons throughout the State. At all relevant times, Wexford was responsible for implementing, overseeing, and supervising policies and practices at Stateville and IDOC generally. As an agent of IDOC, Wexford was at all relevant times acting under color of law by and through its lawful agents, including Defendant Berzinski and other unknown healthcare employees at Stateville.

13.     Defendant IDOC is an entity of the State of Illinois. The IDOC operates Stateville Correctional Center and had custody of Michael Broadway at all relevant times.

14.     At all relevant times, Defendant Charles Truitt was the warden of Stateville Correctional Center and an employee of IDOC. Defendant Truitt oversaw Stateville's facilities, received reports about the conditions at Stateville, and regularly toured the prison, giving him both knowledge of and responsibility for the conditions at Stateville and the health and safety of the people incarcerated there. Defendant Truitt is sued in his individual capacity. At all relevant times, Defendant Truitt was acting under color of law and within the scope of his employment with the IDOC.

15.     At all relevant times, Defendant Jermiagh Daly was the chief stationary engineer of Stateville Correctional Center and an employee of IDOC. Defendant Daly oversaw Stateville's facilities, received reports about the conditions at Stateville, and regularly toured the prison, giving

him both knowledge of and responsibility for the conditions at Stateville and the health and safety of people incarcerated there. Defendant Daly is sued in his individual capacity. At all relevant times, Defendant Daly was acting under color of law and within the scope of his employment with the IDOC.

16.     At all relevant times, Defendants Amelia Arinaga and Kenneth Nushardt were correctional sergeants at Stateville and employees of IDOC. Defendants Arinaga and Nushardt are sued in their individual capacities. At all relevant times, Defendants Arinaga and Nushardt were acting under color of law and within the scope of their employment with the IDOC.

17.     At all relevant times, Defendants Michael Bird, Patrick Gagliardo, Anthony Garant, Shane Leiby, Jeffery Lovett, John Anderson Orock, and Raymond Pahl were correctional officers at Stateville and employees of IDOC. Defendants Bird, Gagliardo, Garant, Leiby, Lovett, Orock, and Pahl are sued in their individual capacities. At all relevant times, Defendants Bird, Gagliardo, Garant, Leiby, Lovett, Orock, and Pahl were acting under color of law and within the scope of their employment with the IDOC.

18.     At all relevant times, Defendant Britney Harvey was a correctional lieutenant at Stateville and an employee of IDOC. Defendant Harvey is sued in her individual capacity. At all relevant times, Defendant Harvey was acting under color of law and within the scope of her employment with the IDOC.

19.     At all relevant times, Defendant Edward Berzinski was a registered nurse at Stateville and an employee of Wexford. Defendant Berzinski is sued in his individual capacity. At all relevant times, Defendant Berzinski was acting under color of law and within the scope of his employment with Wexford.

20.     At all relevant times, Defendant Jennifer Henning was a licensed practical nurse at Stateville and an employee of IDOC. Defendant Henning is sued in her individual capacity. At all relevant times, Jennifer Henning was acting under color of law and within the scope of her employment with IDOC.

### ALLEGATIONS

21.     Michael Broadway, known affectionately by his friends as "B-Way," had a contagious smile that illuminated even the darkest of spaces. He was charismatic, compassionate, and hopeful against all odds.

22.     Despite the immense challenges of attending college while in a prison environment, Michael earned his bachelor's degree from Northwestern University in November 2023. It was one of his proudest accomplishments.



23.     The same fall, Michael published a novel, *One Foot In*, a coming-of-age story about two best friends navigating life in a tough Chicago neighborhood. By 2024, he was already working on the sequel.

24.     Michael's success and perseverance made him a role model to many inside and outside the IDOC. As one of his classmates in the Northwestern Prison Education Program recalls, Michael "opened doors with his words and shined a light on all that we can do if we have the right mindset." His loved ones remember that he never failed to congratulate others on their achievements and encourage them in their pursuits.

25.     Michael planned to get a master's degree in creative writing. He dreamed of writing more books and pursuing a career as an author, proving his innocence, and starting a nonprofit (the Rich Soil Project) to help disadvantaged young men pursue their educations. Michael will never be able to pursue any of these dreams. On Juneteenth 2024, Michael Broadway took his last breath within the crumbling walls of Stateville Correctional Center.

**Illinois Announced Plans to Close Stateville Due to Serious Risks of Imminent Harm**

26.     Stateville is a notoriously old and dilapidated prison. It opened nearly 100 years ago in 1925.

27.     The main building used to house Stateville residents is called the "quarterhouse." It is a large rectangular building divided into four housing units (Bravo, Charlie, Delta, and Edward Houses). The quarterhouse was part of the original construction of Stateville and received very few meaningful improvements or repairs over the ensuing century.

28.     In 2013, Stateville residents brought a class-action lawsuit over the unconstitutional conditions at the prison. A class of current and future Stateville residents was certified in early 2014.

29.     In the fall of 2018, the district court presiding over the class action appointed an expert to evaluate the structural integrity of Stateville's buildings, including the quarterhouse. That

expert authored a report in October 2019, which identified concerning signs of severe degradation in the quarterhouse's foundation.

30.     Further testing confirmed the dangerously dilapidated state of the main housing building at the prison. In May 2023, an independent contractor hired by the State of Illinois warned that the prison's housing units were "not suitable for any 21st century correctional center" and required "an estimated $12 million in immediate structural repairs."

31.     Years before Michael's death, the class and class counsel reported to the IDOC that temperatures in the quarterhouse were dangerously high, particularly during the summer months and in the upper galleries. The class further reported that the high temperatures were particularly dangerous given the lack of meaningful air circulation and ventilation. On information and belief, temperature readings taken by IDOC in summer 2024 confirmed dangerously high temperatures throughout the quarterhouse, including in Edward House, where Michael was housed when he died.

32.     On information and belief, Defendant Charles Truitt, the warden of Stateville, and Jermiagh Daly, Stateville's chief engineer, would regularly tour the quarterhouse, including Edward House, and personally observe the dangerously high temperatures, particularly in the upper galleries. These Defendants further received temperature readings on a regular basis. Despite being aware of the acute health and safety risk, these Defendants took no meaningful action to address it.

33.     In March 2024, Governor of Illinois J.B. Pritzker announced that Stateville would be demolished and rebuilt because of "critical infrastructure needs." Closure was necessary, as IDOC Acting Director LaToya Hughes conceded at a legislative review panel, "to address serious safety and security concerns posed to those who work and live in Stateville."

**Despite the Announced Closure, Hundreds of Prisoners Remained at Risk**

34.     Although there were hundreds of vacancies at nearby IDOC prisons, male prisoners remained incarcerated at Stateville in horrific and dangerous conditions throughout spring and summer 2024. Heavy debris crumbled from the walls and ceiling. Bird feces littered the floor. The water was brown and previously was found to contain dangerous bacteria, including legionella which causes the deadly lung infection Legionnaires' disease.

35.     The dangerous conditions inside Stateville were exacerbated by an oppressive and unrelenting heat wave in June 2024. Outdoor temperatures soared to nearly 100 degrees. On information and belief, the temperatures inside the quarterhouse were even higher, particularly in the upper galleries, as heated air was trapped within the cellhouse due to the abject lack of meaningful ventilation or air circulation.

36.     Conditions at Stateville became so dangerous that in August 2024, U.S. District Court Judge Andrea R. Wood entered a preliminary injunction mandating the closure of Stateville (except for the prison's healthcare unit) and requiring that all men living at the prison be transferred out of the prison. In compliance with that order, IDOC moved almost all of the prisoners to other IDOC facilities. Unfortunately, Judge Wood's order came too late for Michael.

**Michael Was Denied an Accommodation for His Severe Asthma and Assigned to Live in a Dangerously Hot Cell on the Top Floor of Edward House**

37.     Michael suffered from severe asthma since childhood. High temperatures and humidity are well-known triggers of asthma attacks. Wexford's medical plan for Michael warned in bold and with an exclamation point that **"Asthmatic Patients may rapidly deteriorate!"** and instructed medical staff to "Call 911 for severe respiratory distress." Further, Michael's medical records expressly indicated that humidity and high temperatures posed special risk:

*- Any situations that make your breathing worse?*

*humidity high temps*

38.     Michael's asthma was so severe that he requested a special medical order, called a "low-gallery permit," to ensure that he would be assigned to a cell on a low floor within the cellhouse. Upon information and belief, when Michael moved into Edward House, he informed IDOC officials that he needed to be on a low gallery because of his severe asthma. IDOC denied his requests and assigned him to a cell on the fifth floor—the highest and hottest gallery in Edward House. They did so even though there were empty cells on lower floors.

39.     Like the rest of the quarterhouse at Stateville, Edward House had no air conditioning. It is an old concrete building that traps the heat. Spring 2024 was one of the hottest on record in Illinois. Nevertheless, the windows in Edward House remained nailed shut.

40.     There was a large industrial fan directly in front of Michael's cell which could have given him some relief from the heat and reduced his elevated risk of a severe asthma attack. Michael and other people living on the fifth floor made repeated requests to staff to turn the fan on. But staff refused, so the fan remained padlocked and unused during the record June heat.

41.     On one hot day before Michael's death, Defendant Truitt toured Michael's gallery. Michael and a neighboring prisoner, Anthony Ehlers, told Defendant Truitt that the temperatures were excessively high, the windows were nailed shut, and the fan in front of their cells was padlocked. Defendant Truitt told Michael and Anthony that he was aware of those issues and would get them fixed. But even though the temperatures worsened throughout the summer, Defendant Truitt never took any meaningful action to ensure that the windows were opened and the fans were turned on, or to otherwise address the extreme heat inside Edward House.

**Michael Suffered a Severe Asthma Attack, Which Defendants
Responded to with Deliberate Indifference**

42.     On the afternoon of June 19, Michael was locked inside his cell on the fifth floor of Edward House. The heat index in the Stateville area reached nearly 100 degrees.

43.     On information and belief, the temperature in Michael's cell, which was indoors with no meaningful air circulation or ventilation, was significantly hotter than the ambient temperature. Men living in cells next to Michael estimated that it was 115 to 120 degrees on the fifth floor that afternoon.

44.     Because of the oppressive heat and his severe asthma, Michael began to struggle to breathe. Between gasps for air, he pleaded for help from his friends in the cells next to him, Anthony Ehlers and Robert Cloutier. Michael's voice was already weak when he told them that he couldn't breathe.

45.     Anthony and Robert immediately and urgently called out to a nearby correctional officer, Defendant Patrick Gagliardo, for help. Anthony knew that Michael suffered from asthma and told Defendant Gagliardo that he believed Michael was having an asthma attack. Defendant Gagliardo could observe Michael was sitting on his bed, unable to speak and struggling to breathe.

46.     IDOC correctional officers are trained to call a "Code 3" over the radio whenever a prisoner needs urgent medical treatment. A Code 3 call alerts correctional and medical staff that there is a medical emergency and requires medical staff to respond promptly with a bag that contains life-saving medical equipment, including (among other things) vitals equipment, saline solution, an automatic external defibrillator (AED), and an Ambu bag, which is a hand-held device to provide ventilation to patients who are not breathing adequately.

47.     Upon information and belief, Defendant Gagliardo knew that complaints of respiratory distress require immediate medical attention. Despite that knowledge, Defendant

Gagliardo did not call a Code 3. Instead, Defendant Gagliardo called down to a lieutenant on the first floor of Edward House, Defendant Britney Harvey, and informed her that a prisoner on the fifth floor needed medical attention.

48.     With shocking disregard for Michael's safety and humanity, Defendant Harvey responded something along the lines of: "It is too hot for all that. He can wait until I'm done running my lines out." Defendant Harvey was referring to moving prisoners in "lines" in and out of their cells to the food hall or yard. When a Code 3 is called, all lines and radio traffic in the prison must stop so that health care personnel can move quickly to respond to the emergency and provide necessary medical care. While Michael painfully fought to breathe, Defendant Harvey was more concerned with routine prison administration and "running [her] lines" than providing Michael with life-saving medical assistance.

49.     After hearing Defendant Harvey refuse to help Michael, Defendant Gagliardo still did not call a Code 3 or 911 (or direct other staff to call a Code 3 or 911) or take any other meaningful action he knew was necessary to save Michael's life. Instead, he huddled together with three other correctional officers on the fifth floor—Defendants John Anderson Orock, Anthony Garant, and Kenneth Nushardt—in an officer-only area a few cell doors away from Michael.

50.     Defendants Orock, Garant, and Nushardt could see Michael suffering and knew that immediate action was required to address Michael's medical emergency. But they also did not call a Code 3 or 911 or otherwise ensure that Michael would receive medical assistance.

51.     Throughout this time, Anthony and Robert continued yelling for help, pleading for someone to come aid Michael. Other incarcerated men in Edward House joined in their pleas, doing all they could to secure immediate medical assistance. Their yells continued for several

minutes while Defendants Gagliardo, Orock, Garant, and Nushardt stood by and simply watched Michael's condition worsen.

### As Michael Fought for His Life, Correctional and Medical Staff Did Nothing to Provide Minimally Effective Treatment

52.    Approximately 15 to 20 minutes after Defendant Gagliardo first saw Michael in life-threatening respiratory distress, a licensed practical nurse, Defendant Jennifer Henning finally arrived at the cellhouse. According to her medical notes, Defendant Henning was "called to E-house for pt. having trouble breathing."

> O: Called to E-house,
> cell 909 for pt. having
> trouble breathing. Upon
> arrival at unit, was in-
> formed pt. was not respond-
> ing. Upon arrival at cell,

53.    Despite being aware of Michael's need for urgent medical attention, Defendant Henning walked slowly to Edward House. Even more astonishingly, upon arrival Defendant Henning *refused* to walk up the stairs to Michael's cell.

54.    Defendant Henning told Defendant Harvey and Defendant Amelia Arinaga, a correctional sergeant, that she would not go to Michael's cell because it was "too hot upstairs." She insisted that Michael—who she knew was struggling to breathe—would need to come downstairs to her.

55.    Neither Defendant Harvey nor Defendant Arinaga offered any pushback, despite the fact both Defendants had been made aware of Michael's need for medical attention. They did not insist that Defendant Henning immediately go upstairs to provide Michael with medical assistance. They did not call 911 or direct other staff to call 911. They did not call a Code 3. They

13

did not summon another member of the medical staff to Michael's cell so that he could receive the life-saving medical attention he so desperately needed.

56.     While Defendant Henning idled downstairs resisting her duties, knowing that Michael was struggling to breathe, Defendant Jeffrey Lovett, a correctional officer, walked up to Michael's cell. Defendant Lovett found Michael holding his neck and gasping for breath. Defendant Lovett then called or walked down to the first floor and told Defendants Henning, Harvey, and Arinaga that Michael was not responsive. Defendant Lovett did not call a Code 3, 911, or otherwise act with any urgency to ensure that Michael received prompt medical attention.

57.     Several minutes after her arrival to Edward House, Defendant Henning walked up the five flights of stairs, taking several more minutes to do so. One prisoner heard her mutter "this is stupid" as she ascended the stairs. Several prisoners recall that her steps lacked any urgency.

58.     Despite knowing that Michael was not responsive and faced an imminent risk of serious harm, Defendant Henning did not bring the standard bag of medical equipment prepared for medical staff responding to medical emergencies. In fact, she did not bring *any* medical equipment. Most critically, she did not bring the Ambu bag, the hand-held resuscitator that is part of the standard equipment bag and that would have provided Michael with life-saving mechanical ventilation.

59.     When Defendant Henning finally made it to Michael's cell, Michael was "sitting on [his] bed, leaning against the wall but not responding to verbal commands." As Defendant Henning passed by Anthony Ehler's cell, Anthony told her that Michael had asthma and had been unable to breathe. Defendant Henning acknowledged that she heard him.

60.     Despite being told that Michael was asthmatic and struggling to breath, when Defendant Henning finally encountered Michael and saw that he was unconscious, she

14

administered only naloxone—an opioid overdose reversal medicine. Michael had not used opioids (or any other illicit substances). Unsurprisingly, the naloxone was completely ineffective.

61.     When the naloxone provided no therapeutic response—a predictable result given her knowledge that Michael was suffering from an asthma attack—Defendant Henning did not employ alternative methods to save Michael's life. Instead, she summoned and then administered a *second* dose of naloxone. That dose, like the first, had no effect on Michael because he had not overdosed on, or even used, opioids.

62.     After administering two doses of naloxone, which were ineffective and unindicated, Defendant Henning just stood there. She did nothing further to try to assist Michael.

### Defendants' Deliberate Indifference Caused Michael's Tragic Death

63.     Defendants Harvey, Arinaga, Michael Bird, Shane Leiby, and Raymond Pahl were standing by Michael's cell and watching as Defendant Henning's two separate administrations of naloxone did nothing to address Michael's medical emergency—an outcome they knew was inevitable since they knew Michael's emergency arose not from an overdose, but instead from an asthma attack in a dangerously hot and unventilated cell.

64.     Despite this knowledge, and even after watching Defendant Henning's administration of naloxone provide no therapeutic effect, Defendants Harvey, Arinaga, Bird, Leiby, and Pahl took no meaningful action to ensure that Michael received oxygen or other treatments necessary to address his respiratory distress. The sole actions that these Defendants took were to summon ice to be brought to Michael's cell and to attempt to resuscitate him with chest compressions. But still, they did not call a Code 3. They did not call 911 or direct other staff to call 911. They did not contact the healthcare unit to request that other medical staff respond to the situation.

15

65.     Several minutes after the second ineffective naloxone spray, someone finally called a Code 3. Defendant nurse Edward Berzinski then arrived at Edward House with two other nurses. None of them carried standard lifesaving medical equipment, like a Ambu bag or AED, as required by IDOC policy for responding to a Code 3.

66.     Finally, someone brought a stretcher to Michael's fifth-floor cell. But the stretcher was missing straps and handles and so could not be used to carry Michael downstairs. Yet again, Defendants wasted precious time while Michael continued to deteriorate.

67.     While Defendants delayed moving Michael, Nurse Berzinski went down to the officers' station on the ground floor of Edward House and called 911. He told the 911 operator that Michael was "unresponsive, in and out of consciousness," "his pulse [wa]s thready, weak," and his breathing was "very, very shallow." Nurse Berzinski also reported that it was "probably possible heat stroke," emphasizing that it was "100-something degrees in [the cell house]."

68.     After several minutes of delay, Defendants released Robert Cloutier from his cell so he could assist them. Robert and the officers carried Michael downstairs using Robert's bed sheets. Robert recalls that they passed the industrial fan—still padlocked and nonfunctional—while bringing Michael's unconscious and unresponsive body down the stairs.

69.     Nearly an hour after Michael first called for help, Michael was finally transported by ambulance to St. Joseph's Hospital. He was declared dead soon after arrival.

70.     The Will County Coroner's Office determined that Michael's cause of death was "bronchial asthma" and that heat stress was a "significant contributing condition."

71.     Upon information and belief, the large industrial fan on the fifth floor remained padlocked and turned off for at least a month after Michael's death, and the windows in Edwards House, which still had no air conditioning, remained nailed shut for the rest of summer 2024.

16

72.     Stunningly, Defendant Truitt awarded Defendants Arinaga, Bird, Leiby, Lovett, and Pahl with a "Team Efforts Award Commendation," praising them for their "seamless execution of the emergency response plan." Even though Michael died as a result of Defendants' indifference, the so-called "commendation" makes no mention of Michael or the fact that he died an entirely preventable death.

## COUNT I
## 42 U.S.C. § 1983 – Deliberate Indifference (Eighth Amendment)
## All Individual Defendants and Wexford

73.     Each of the Paragraphs of this Complaint is incorporated herein.

74.     In the manner described more fully above, Defendants were aware of Michael Broadway's acute medical needs and the seriousness of his medical needs and they knew the risk of harm to Michael if he did not receive appropriate medical care.

75.     Despite that knowledge, Defendants failed to provide him with proper medical care or access to medical care, in violation of the Eighth Amendment to the United States Constitution.

76.     As a result of Defendants' unjustified and unconstitutional conduct, Michael experienced injuries, including but not limited to pain, suffering, emotional distress, and death.

77.     Defendants were deliberately indifferent to Michael's objectively serious medical needs, and their actions were undertaken intentionally, with malice, and/or reckless indifference to Michael's rights.

78.     At all times relevant to the events at issue in this case, Defendants Truitt and Daly were aware of the conditions at Stateville and responsible for the creation, implementation, oversight, and supervision of measures to improve Stateville conditions and protect people incarcerated at Stateville from harm caused by those conditions.

79.     As of June 2024, Defendants Truitt and Daly had notice of the dangerously high temperatures in the quarterhouse, including Edward House. The temperatures were exacerbated by their failure to ensure that fans were operable and running and that windows were open. Despite their knowledge that extreme heat put prisoners in the quarterhouse at imminent risk of serious physical harm, they took no meaningful action to mitigate this risk.

80.     Defendants Truitt and Daly knew that by failing to take action in response to the extreme temperatures in the quarterhouse, medically vulnerable prisoners like Michael faced a substantial risk of serious harm.

81.     Michael's injuries, including but not limited to pain and suffering, emotional distress, and death were proximately caused by policies and practices of Defendant Wexford Health Sources, Inc.

82.     At all times relevant to the events at issue in this case, Defendant Wexford contracted with the IDOC to provide healthcare to men, including Michael, who were housed in IDOC prisons. As the provider of healthcare services, Wexford was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to prisoners in IDOC custody.

83.     Prior to the events giving rise to Plaintiff's Complaint, Defendant Wexford had notice of widespread policies and practices by healthcare and correctional staff at Stateville pursuant to which prisoners with serious medical needs, like Michael, were routinely denied medical care and access to medical care. It is common within the IDOC to see prisoners with clear symptoms of serious medical needs and whose medical treatment is routinely delayed or completely ignored by healthcare and correctional employees. Despite knowledge of these problematic policies and practices, Defendant Wexford did nothing to ensure that prisoners in

18

IDOC received adequate medical care and access to medical care, thereby acting with deliberate indifference.

84.     Specifically, there exist policies or widespread practices in IDOC pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly fail to respond or follow up on complaints by prisoners about their health status; (2) healthcare personnel delay in responding to emergent situations; (3) healthcare personnel fail to respond to emergent situations with necessary medical equipment and/or do not sufficiently stock the bare minimum medical equipment; (4) healthcare personnel fail to adequately diagnose or treat patients in their care; and (5) healthcare personnel delay in contacting emergency medical services (i.e., 911) even when such emergent offsite treatment is necessary.

85.     These widespread policies and practices were allowed to flourish because Defendant Wexford, which directs the provision of healthcare services within the IDOC, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendant Wexford violated Michael's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

86.     The above-described practices, so well-settled as to constitute de facto policy within the IDOC, were able to exist and thrive because Defendant Wexford was deliberately indifferent to the problem, thereby effectively ratifying it.

87.     Michael's injuries were caused by employees of IDOC and Wexford, including but not limited to the individually named Defendants, who acted pursuant to the foregoing policies and practices in engaging in the misconduct described above.

**COUNT II**
**42 U.S.C. § 1983 – Failure to Intervene (Eighth Amendment)**
**All Individual Defendants**

88.     Each of the Paragraphs of this Complaint is incorporated herein.

89.     In the manner more fully described above, the Individual Defendants had a reasonable opportunity to prevent the violation of Michael's constitutional rights as set forth above had they been so inclined, but they failed to do so.

90.     Defendants' failures to act were intentional, done with malice, and/or done with reckless indifference to Michael's rights.

91.     As a direct and proximate result of the illicit prior agreement referenced above, Michael's rights were violated and he suffered injuries, including but not limited to emotional distress and death.

**COUNT III**
**42 U.S.C. § 1983 – Conspiracy (Eighth Amendment)**
**All Individual Defendants**

92.     Each of the Paragraphs of this Complaint is incorporated herein.

93.     Defendants reached an agreement among themselves to deprive Michael of his constitutional rights and to protect one another from liability for depriving Michael of his rights, all as described in the various paragraphs of this Complaint.

94.     In the furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

95.     The misconduct described in this Count was undertaken intentionally, with malice, and/or with reckless indifference to Michael's rights.

96.     As a direct and proximate result of the illicit prior agreement referenced above, Michael's rights were violated and he suffered injuries, including but not limited to emotional distress and death.

97.     Michael's death was caused by employees of the IDOC and Wexford, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

**COUNT IV**
**42 U.S.C. § 12101 – Americans with Disabilities Act**
**Defendant IDOC**

98.     Each of the Paragraphs of this Complaint is incorporated herein.

99.     Congress enacted the Americans With Disabilities Act (ADA) "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

100.    Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

101.    To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."

102.    The IDOC is a public entity as defined in 42 U.S.C. § 12131(1).

103. Michael had a disability—asthma—within the meaning of the Americans with Disabilities Act. He was otherwise qualified to participate in programs, services, or benefits offered by IDOC, including but not limited to access to medical services.

104. The IDOC was aware of Michael's disability.

105. Under Title II of the ADA and 28 C.F.R. § 35.130(a), the IDOC is responsible for ensuring that individuals in its custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability, excluded from participation in or denied the benefits of its services, programs, or activities because of their disability.

106. Despite Michael Broadway's known and obvious disability, the IDOC failed to reasonably accommodate his disability and discriminated against him, as described herein.

107. Michael requested an accommodation for his disability, and the need for one was obvious, but IDOC failed to provide a reasonable accommodation.

108. Accordingly, the Defendants' conduct as alleged in the Complaint violated Title II of the Americans with Disabilities Act.

**COUNT V**
**29 U.S.C. § 701 – Rehabilitation Act**
**Defendant IDOC**

109. Each of the Paragraphs of this Complaint is incorporated herein.

110. Michael had a disability—asthma—within the meaning of the Rehabilitation Act. He was otherwise qualified to participate in programs, services, or benefits offered by the IDOC, including but not limited to access to medical services.

111. Under the Rehabilitation Act, the IDOC is responsible for ensuring that individuals in its custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability, excluded from

participation in or denied the benefits of its services, programs, or activities because of their disability.

112.    The IDOC received federal funding.

113.    Despite Michael's known disability, the Defendants failed to reasonably accommodate his disability as described above. As a result of the Defendants conduct, Michael suffered injuries, including pain, suffering, and death.

114.    Accordingly, Defendants' conduct as alleged in the Complaint violated the Rehabilitation Act.

## COUNT VI – State Law Claim
## 740 ILCS 180/1 – Wrongful Death
## All Defendants

115.    Each of the Paragraphs of this Complaint is incorporated herein.

116.    In the manner more fully described above, the actions of the Defendants breached the duty of care owed to prisoners in their custody. They did so by negligently ignoring Michael's requests for medical attention.

117.    Alternatively, the actions of the Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were conscious that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

118.    Defendants' actions were undertaken willfully, wantonly, and with reckless indifference or conscious disregard for the safety of others.

119.    As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Michael suffered injuries, including death and great pain and suffering.

120.    Plaintiff Chunece Jones-Broadway, and all other legally recognized family members, claim damages for the wrongful death of Michael, and for the loss of his services,

protection, care, future income, assistance, society, companionship, comfort, guidance, counsel and advice, and for the mental anguish caused by this loss, as well as for funeral expenses pursuant to 740 ILCS § 180/1, the Illinois Wrongful Death Act.

**COUNT VII – State Law Claim**
**755 ILCS 5/27-6 – Survival Action**
**All Defendants**

121.    Each of the Paragraphs of this Complaint is incorporated herein.

122.    In the manner more fully described above, the actions of the Defendants breached the duty of care owed to prisoners in their custody. They did so by ignoring Michael's requests for medical attention.

123.    Alternatively, the actions of Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were conscious that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

124.    Defendants' actions were undertaken willfully, wantonly, and with reckless indifference or conscious disregard for the safety of others.

125.    As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Michael suffered great conscious pain and suffering prior to his death.

126.    Michael filed no action during his lifetime, but under the law of the State of Illinois, this action survives and may be asserted by his Estate.

127.    Plaintiff Chunece Jones-Broadway, on behalf of the Estate of Michael Broadway, claims damages for the conscious pain and suffering of Michael, pursuant to 755 ILCS § 5/27-6, commonly referred to as the Illinois Survival Act.

## COUNT VIII
## Respondeat Superior
## Defendant Wexford

128.     Each of the Paragraphs of this Complaint is incorporated herein.

129.     In committing the acts alleged in the preceding paragraphs, Defendant Berzinski was an employee of Wexford, acting at all relevant times within the scope of his employment.

130.     Consequently, Defendant Wexford is liable for the actions of Defendant Berzinski acting within the scope of his employment under state law.

131.     Defendant Wexford, as private corporation acting under color of state law, should additionally be held liable under 42 U.S.C. § 1983 for the conduct of its employee acting within the scope of his employment. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 793-95 (7th Cir. 2014).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Chunece Jones-Broadway, as Administrator of the Estate of Michael Broadway, hereby respectfully requests that this Court enter a judgment in her favor and against Defendants Illinois Department of Corrections, Wexford Health Sources, Inc., Charles Truitt, Jermiagh Daly, Britney Harvey, Amelia Arinaga, Kenneth Nushardt, Michael Bird, Patrick Gagliardo, Anthony Garant, Shane Leiby, Jeffery Lovett, John Anderson Orock, Raymond Pahl, Edward Berzinski, and Jennifer Henning, awarding compensatory damages, punitive damages, attorney fees and costs, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff Chunece Jones-Broadway hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

25

Dated: March 13, 2025

Respectfully submitted,

/s/ *Terah Tollner*
Terah Tollner
Attorney for Plaintiff

Sarah Grady
Vanessa del Valle
Terah Tollner
David Howard Sinkman
Amelia Caramadre
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, Illinois 60614
(312) 248-6999
terah@kaplangrady.com