IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHUNECE JONES-BROADWAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 24-cv-11700 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| ILLINOIS DEPARTMENT | ) | |
| OF CORRECTIONS (IDOC), et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael Broadway suffered an asthma attack and died in the custody of the Illinois Department of Corrections ("IDOC") while incarcerated at Stateville Correctional Center ("Stateville"). His widow, Plaintiff Chunece Jones-Broadway, as administrator of Broadway's estate, has sued the IDOC, its healthcare provider, Wexford Health Sources, Inc. ("Wexford"), and multiple employees of both entities, for their alleged role in Broadway's death. Jones-Broadway asserts constitutional claims for deliberate indifference to a serious medical need, failure to intervene, and conspiracy, pursuant to 42 U.S.C. § 1983, as well as several other federal and state statutory claims. All Defendants now move to dismiss parts of the Amended Complaint through three separate motions to dismiss for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. Nos. 17, 52, 60.) For the reasons discussed below, each motion is granted in part and denied part.

**BACKGROUND**

For purposes of the motions to dismiss, the Court accepts as true all well-pleaded facts in the Amended Complaint and views those facts in the light most favorable to Jones-Broadway as

the non-moving party. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). Jones-Broadway's Amended Complaint alleges as follows.

In June 2024, Michael Broadway was incarcerated at Stateville. (Am. Compl. ¶ 1, Dkt. No. 77.) He suffered from severe asthma, a condition he had since childhood. (*Id.* ¶ 37.) Wexford's medical plan for Broadway warned that as an asthmatic patient, Broadway's health may rapidly deteriorate. (*Id.*) It also instructed medical staff to call 911 in the event of severe respiratory distress. (*Id.*) Moreover, Broadway's medical records specifically noted that humidity and high temperatures posed a risk to his health. (*Id.*) Accordingly, Broadway requested a "low-gallery permit" to ensure he would be assigned to a cell on a low floor of the cellhouse. (*Id.* ¶ 38.) The IDOC denied that request. (*Id.*) Broadway was assigned a cell on the fifth, and highest, floor, even though there were empty cells on lower floors. (*Id.*)

At the time of Broadway's death on June 19, 2024, Stateville was a nearly 100-year-old institution. (*Id.* ¶ 26.) Edward House, the housing unit where Broadway was housed when he died, showed its age and was in a dangerously dilapidated condition. (*Id.* ¶¶ 27, 31.) Most relevant here, temperatures in the Stateville housing units could be dangerously high, especially during the summer months and in the upper galleries of the building. (*Id.* ¶ 31.) In a separate, unrelated class-action lawsuit about conditions at Stateville, the plaintiffs told the IDOC about the dangerously high temperatures years prior to Broadway's death. (*Id.*) The class plaintiffs further informed the IDOC that the high temperatures were particularly dangerous because the housing units lacked meaningful air circulation and ventilation. (*Id.*)

In June 2024, when Broadway died, the conditions inside Stateville were exacerbated by an unrelenting heat wave driving outdoor temperatures that approached 100 degrees. (*Id.* ¶ 35.) The temperatures inside Edward House, particularly in the upper galleries, were even higher.

(*Id.*) Temperature readings taken by the IDOC in the summer of 2024 confirmed dangerously high temperatures. (*Id.* ¶ 31.) In addition, Defendant Charles Truitt, the warden of Stateville, and Jermiagh Daly, Stateville's chief stationary engineer, regularly toured Edward House, personally observing the dangerously high temperatures, and received temperature readings on a regular basis. (*Id.* ¶ 32.)

Edward House lacked air conditioning and at the time of Broadway's death the windows in the building were nailed shut. (*Id.* ¶ 39.) There was, however, a large industrial fan directly in front of Broadway's cell on the fifth floor of Edward House. (*Id.* ¶ 40.) Despite repeated requests from Broadway and other incarcerated men on the floor, the staff refused to turn on the fan to provide some relief from the heat. (*Id.*) Leading up to Broadway's death, no one at Stateville took any meaningful action to address the extreme heat in the housing units. (*Id.* ¶¶ 32, 41.)

IDOC correctional officers are trained to call a "Code 3" radio signal whenever a prisoner needs urgent medical care. (*Id.* ¶ 46.) Medical staff are required to respond promptly to a Code 3 call with an equipment bag ("Emergency Bag") that includes, among other things, an automatic external defibrillator ("AED") and an Ambu bag, which is a device used to provide ventilation to patients who are not breathing adequately. (*Id.*)

On June 19, 2024, Broadway was locked in his cell. (*Id.* ¶ 42.) The heat index in the area reached nearly 100 degrees, but men living in neighboring cells estimated that it was 115 to 120 degrees indoors on the fifth floor of Edward House that afternoon. (*Id.* ¶¶ 42–43.) The heat triggered Broadway's severe asthma, and he began to struggle to breathe. (*Id.* ¶ 44.) His voice already weak, he pleaded for help from friends in neighboring cells. (*Id.*) Those friends, Anthony Ehlers and Robert Cloutier, immediately called out to Defendant Patrick Gagliardo, a nearby correctional officer, for help. (*Id.* ¶ 45.) Ehlers knew that Broadway suffered from asthma and

told Officer Gagliardo that he believed Broadway was having an asthma attack. (*Id.*) Gagliardo could also see that Broadway was struggling to breathe. (*Id.*) Despite knowing that complaints of respiratory distress require immediate medical attention, Officer Gagliardo did not call a Code 3. (*Id.* ¶ 47.) Instead, Gagliardo called down to Defendant Britney Harvey, a lieutenant on the first floor, and told her that a prisoner on the fifth floor needed medical attention. (*Id.* ¶ 47.)

Harvey responded, in essence, that it was too hot for her to act immediately. (*Id.* ¶ 48.) She was moving prisoners out of their cells and stated that Broadway could wait until she was finished. (*Id.*) Calling a Code 3 would have required all prisoner movement and radio traffic to stop so that health care personnel could move quickly to respond to the emergency. (*Id.*) Harvey did not call a Code 3 or take any action to help Broadway. (*Id.* ¶ 49.)

Once Harvey refused to act, Gagliardo huddled with three other correctional officers, Defendants John Anderson Orock, Anthony Garant, and Kenneth Nushardt, in an officer-only area a few cells away from Broadway. (*Id.*) Defendants Orock, Grant, Nushardt, and Gagliardo, could see Broadway struggling. (*Id.* ¶ 50.) None called a Code 3 or called 911. (*Id.*) Nor did they do anything else to ensure Broadway received medical assistance. (*Id.*) As Ehlers and Cloutier, now joined by other incarcerated men, yelled for help for several minutes, Defendants Orock, Grant, Nushardt, and Gagliardo stood by and watched Broadway's condition worsen. (*Id.* ¶ 51.)

About fifteen to twenty minutes after Gagliardo first saw Broadway struggling to breathe, Defendant Jennifer Henning, a licensed practical nurse employed by the IDOC, arrived at Edward House. (*Id.* ¶ 52.) Henning's medical notes state that she was called to the cellhouse for a patient having trouble breathing. (*Id.*) Despite being aware of the urgency of the situation, Henning walked slowly to Edward House. (*Id.* ¶ 53.) Upon arriving, Henning refused to walk up the stairs to Broadway's cell. (*Id.*) Her refusal, she told Harvey and Defendant Amelia Arinaga, a

4

correctional sergeant, was because it was "too hot upstairs." (*Id.* ¶ 54.) Aware that Broadway was struggling to breathe, she insisted that he would need to come downstairs to her. (*Id.*) At this point, still, none of the Defendants at Edward House called a Code 3, called 911, or directed anyone to call 911. (*Id.* ¶ 55.)

While Henning waited downstairs at Edward House, Defendant Jeffrey Lovett, a correctional officer, walked up to Broadway's cell. (*Id.* ¶ 56.) He found Broadway holding his neck and gasping for breath. (*Id.*) Lovett then called or walked down to the first floor and told Henning, Harvey, and Arinaga that Broadway was not responsive. (*Id.*) However, he did not call a Code 3 or call 911. (*Id.*)

After this update, and several minutes after arriving at Edward House, Henning walked up the stairs to the fifth floor. (*Id.* ¶ 57.) She allegedly took several more minutes to do so and was heard muttering, "this is stupid," as she climbed. (*Id.*) She did not, however, bring an Emergency Bag, or any medical equipment, with her. (*Id.* ¶ 58.) As a result, she did not have an Ambu bag, which might have been used to provide Broadway with mechanical ventilation. (*Id.*) And as Henning walked by Ehler's cell, he told her that Broadway was asthmatic and struggling to breathe. (*Id.* ¶ 59.)

Broadway was unconscious when Henning arrived. (*Id.*) Although Henning was told that Broadway was most likely suffering from an asthma attack, she treated him by administering a dose of naloxone, which is an opioid overdose reversal medicine. (*Id.* ¶ 60.) Because Broadway had not used any opioids, the naloxone had no effect. (*Id.*) Henning then administered a second dose of naloxone, also to no effect. (*Id.* ¶ 61.) After the naloxone doses proved ineffective, Henning did nothing further to treat Broadway. (*Id.* ¶ 62.) She allegedly just stood there. (*Id.*)

While Henning administered the two unsuccessful doses of naloxone, Defendants Michael Bird, Shane Leiby, and Raymond Pahl, all correctional officers, as well as Harvey and Arinaga, stood by the cell watching. (*Id.* ¶ 63.) Once they saw that the naloxone had not worked, these Defendants summoned ice to Broadway's cell and attempted to resuscitate him with chest compressions. (*Id.* ¶ 64.) They did not, however, take any steps to ensure Broadway received oxygen or to otherwise address his respiratory distress. (*Id.*) They still did not call a Code 3 or call 911 or contact the healthcare unit. (*Id.*)

Finally, several minutes after the second naloxone dose, someone called a Code 3. (*Id.* ¶ 65.) Defendant Edward Berzinski, a registered nurse employed by Wexford, and two other unidentified nurses, then arrived at Edward House. (*Id.*) None of them carried the required Emergency Bag with an AED or Ambu bag. (*Id.*) Someone also brought a stretcher to Broadway's fifth-floor cell, but the stretcher was missing straps and handles. (*Id.* ¶ 65.) As a result, it could not be used to carry Broadway down the stairs. (*Id.*)

While Broadway was still in his cell, Nurse Berzinski went down to the officers' station on the ground floor and called 911. (*Id.* ¶ 67.) Berzinski told the operator that Broadway was unresponsive, had a weak pulse, and had very shallow breathing. (*Id.*) He also reported that Broadway was probably suffering from heat stroke and emphasized that it was over 100 degrees in the building. (*Id.*)

After several minutes of delay after the stretcher was brought, the Defendants released Cloutier from his cell to allow him to assist them. (*Id.* ¶ 68.) Cloutier and the officers carried Broadway downstairs using Cloutier's bed sheets. (*Id.*) Broadway was then transported by ambulance to a hospital, nearly an hour after he first called for help. (*Id.* ¶ 69.)

6

Broadway was declared dead soon after arriving at the hospital. (*Id.*) The Will County Coroner's Office determined that Broadway's cause of death was "bronchial asthma" and that heat stress was a "significant contributing condition." (*Id.* ¶ 70.)

Following her husband's death, Plaintiff Chunece Jones-Broadway, as administrator of Broadway's estate, filed an eight-count Amended Complaint against the IDOC and Wexford, as well as Truitt, Daly, Harvey, Arinaga, Nushardt, Bird, Gagliardo, Garant, Leiby, Lovett, Orock, Pahl, Berzinski, and Henning (collectively, "Individual Defendants"). Count I asserts a claim against all Individual Defendants and Wexford pursuant to 42 U.S.C. § 1983 for deliberate indifference to a serious medical need, in violation of the Eighth Amendment. Count II raises a claim against all Individual Defendants for failure to intervene, in violation of the Eighth Amendment, also brought pursuant to § 1983. Count III alleges a conspiracy to violate the Eighth Amendment by all Individual Defendants. Count IV asserts a claim against the IDOC under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101. Count V raises a similar claim against the IDOC under the Rehabilitation Act, 29 U.S.C. § 701. Count VI raises a tort claim against all Defendants under Illinois's Wrongful Death Act, 740 ILCS 180/1. Count VII asserts a claim for damages against all Defendants for Broadway's pain and suffering, pursuant to the Illinois Survival Act, 755 ILCS 5/27-6. And finally, Count VIII seeks to hold Wexford responsible for its employees' acts based on a theory of *respondeat superior* liability.

In response, Defendants have filed three separate motions to dismiss. Wexford has moved to dismiss counts II, III, VI, VII, and VIII. (Dkt. No. 17.) The IDOC and its employees, except for Henning, (collectively, "IDOC Defendants") have moved to dismiss Counts I–VII, at least

with respect to some Defendants.[1] (Dkt. No. 52.) Finally, Berzinski has moved to dismiss Counts II, III, VI, and VII. (Dkt. No. 60.)

## DISCUSSION

Under federal notice pleading standards, a "plaintiff's complaint need only provide a short and plain statement of the claim showing that the pleader is entitled to relief, sufficient to provide the defendant with fair notice of the claim and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (internal quotation marks omitted). Accordingly, to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

This case involves both federal and related state law claims. Accordingly, this Court exercises subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Although Illinois substantive law applies when considering Jones-Broadway's state law claims, the Court reiterates at the outset that federal pleading requirements apply to all her claims. *Hefferman v. Bass*, 467 F.3d 596, 599 (7th Cir. 2006) ("The Federal Rules of Civil Procedure apply to all

---

[1] Henning has answered all pending claims in the Amended Complaint. (Henning's Answer, Dkt. No. 93.) She has not joined in any motion to dismiss.

cases filed in federal court, no matter what the basis of subject matter jurisdiction."). And "in contrast to the fact pleading Illinois has adopted[,] . . . [i]n federal court under Rule 8, the rules are simple: Notice is what counts. Not facts; not elements of 'causes of action'; not legal theories." *Id.* at 599–600. The allegations in this case assert that sixteen Defendants, among other people, were involved in the chain of events leading up to Broadway's tragic death. And Jones-Broadway asserts a wide range of claims against these Defendants. The Amended Complaint does not state what each Defendant did or did not do at every moment on June 19, 2024, or in the days and weeks prior. But plaintiffs at the pleading stage are not assigned the task of accounting for every fact in detail. *Twombly*, 550 U.S. at 555. At this point, prior to discovery, the Court's role is not to assess which claims Jones-Broadway can ultimately prove against Defendants. Rather, the Court's role is simply to determine which claims are plausible. *Id.* at 570. Or, in other words, the claims for which a Defendant has fairly been placed on notice. *Hefferman*, 467 F.3d at 600.

## I.        Count I: Deliberate Indifference

Count I asserts a deliberate indifference claim against all Individual Defendants and Wexford. Deliberate indifference is beyond negligence, or even malpractice. *See Cesal v. Moats*, 851 F.3d 714, 725 (7th Cir. 2017) (noting the "important difference between ordinary, or even aggravated, medical malpractice, and an Eighth Amendment violation"). A deliberately indifferent defendant must "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The test requires a culpable state of mind. The defendant must be subjectively indifferent to the plaintiff's pain or medical peril. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016).

9

The IDOC Defendants initially argued that Jones-Broadway failed to plead plausible facts as to Daly's personal involvement in the alleged constitutional violation or his knowledge of an excessive risk to Broadway's health. However, in their reply brief, the IDOC Defendants withdrew their argument challenging Count I as to Daly. None of the other Defendants raise an argument challenging Count I. In the end, none of the Defendants move to dismiss the deliberate indifference claim. Accordingly, Jones-Broadway's deliberate indifference claim survives at this stage.

## II.      Count II: Failure to Intervene

Count II of the Amended Complaint asserts a claim for failure to intervene to prevent the violation of Broadway's Eighth Amendment rights. Jones-Broadway brings the claim against all Individual Defendants pursuant to § 1983.[2]

The Seventh Circuit has long recognized "a failure to intervene basis for a constitutional violation under the Eighth Amendment." *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) (internal quotation marks omitted). A defendant who fails to intervene in a constitutional violation can be held liable under § 1983 if the plaintiff shows that the defendant (1) had reason to know that another state actor was committing a constitutional violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring. *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009). Liability is not just limited to the context of a defendant failing to intervene with a colleague from the same department. *Windle v. City of Marion*, 321 F.3d 658, 663 (7th Cir. 2003). But "the rule is not so broad as to place a responsibility on every government employee to

---

[2] Wexford's motion to dismiss spends some time explaining why Count II should be dismissed, as to Wexford, for failure to state a claim. However, as both parties agree, Count II is only raised against the Individual Defendants, not Wexford or the IDOC. Accordingly, there is no need to discuss Wexford's arguments challenging Count II.

intervene in the acts of all other government employees." *Id.* The defendant and the actor who commits the constitutional violation must share some practical relationship or joint responsibility. *Id.*

### A.     The IDOC Defendants

The IDOC Defendants argue that Count II should be dismissed for two reasons. First, they claim that failure to intervene is essentially a theory of vicarious liability and therefore not cognizable under § 1983. And second, they argue that the claim should be dismissed with respect to Daly and Truitt because Jones-Broadway fails to plausibly allege that either official had a realistic opportunity to prevent the alleged constitutional violations committed by the other.

Beginning with the first argument, the IDOC Defendants assert that a failure-to-intervene theory is equivalent to a vicarious liability theory and therefore impermissible under § 1983. *See Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). But the law in this Circuit is clear: defendants may be held liable under § 1983 on a theory that a state actor failed to intervene in an Eighth Amendment violation. *Harper*, 400 F.3d at 1064. "Omissions as well as actions may violate civil rights." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Thus, a failure-to-intervene theory of § 1983 liability is appropriate in some circumstances not because it holds a defendant accountable for the actions of others, but because it holds them accountable for their own constitutional violation. *Id.* at 284–85. Moreover, Count II is asserted only against Individual Defendants. Jones-Broadway does not seek to hold either the IDOC or Wexford vicariously liable for any employee's failure to intervene. As a result, the IDOC Defendants' first argument misses the mark.

11

The second argument is limited to Defendants Daly and Truitt. Recall that Daly was the chief engineer at Stateville and Truitt was Stateville's warden. Both were responsible for Stateville's facilities and received regular reports about the prison's conditions. Jones-Broadway argues that by failing to take action to address the heat at Stateville (*e.g.*, turning on fans, opening windows, etc.), Daly and Truitt each violated Broadway's constitutional rights. She further contends that the allegations allow the reasonable inference that Daly had a realistic opportunity to prevent Truitt's allegedly unconstitutional conduct, and vice versa.

As alleged in the Amended Complaint, neither Truitt nor Daly was present on the day that Broadway died. As such, neither had a realistic opportunity to intervene in the failure of correctional and medical staff to provide timely, adequate medical care to Broadway. Jones-Broadway urges, however, that the underlying constitutional violation should be conceptualized broadly as the failure to address the substantial risk of harm due to the excess heat that summer. That broader view is permissible and supports the deliberate indifference allegations against Daly and Truitt. *See Haywood v. Hathaway*, 842 F.3d 1026, 1031 (7th Cir. 2016) (discussing a deliberate indifference claim against a prison warden premised on his failure to address extreme cold in a prison unit). At this stage, those Defendants do not contest the adequacy of the allegations.

Assessing the failure-to-intervene claim with this alleged constitutional violation in mind, it is plausible that Daly and Truitt each failed to intervene in the inaction of the other to address dangerous heat conditions. Daly and Truitt held overlapping responsibility for ensuring safe facilities at Stateville. The Amended Complaint alleges that both were aware of the dangerous heat as of June 2024. Indeed, it alleges that Broadway, prior to his death, personally told Truitt about the excessive heat, the lack of ventilation, and the fact that the fan in the cellhouse was

shut off and padlocked. (Am. Compl. ¶ 41.) Still, Jones-Broadway alleges that neither Truitt nor Daly took any action to address the dangerous heat.

The IDOC Defendants argue that there is no basis to infer that Truitt and Daly knew or should have known what the other was or was not doing at any given time. But under the federal notice pleading standard, "[k]nowledge . . . , in particular, need not be covered in detail." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009). Daly and Truitt both had responsibility for the safety of Stateville's facilities. Both allegedly knew that the conditions in the Stateville cellhouses in June 2024 were dangerously hot. Given the overlap in responsibility, these factual allegations permit the inference that each knew the other was not acting to address the heat. *See id.* ("[K]nowledge and intent may be pleaded generally (which is to say, in a conclusory fashion)[.] [T]he lack of detail does not permit dismissal."). In addition, the allegations provide a basis to infer that each had a realistic opportunity to prevent the constitutional violation suffered by Broadway. This is not a case where a prisoner seeks to hold an official accountable for failing to do another employee's job. *Cf. Burks*, 555 F.3d at 595 (noting that in the bureaucracy of a prison, "no prisoner is entitled to insist that one employee do another's job."). Rather, it is an instance where two state actors shared a joint responsibility to maintain safe conditions at Stateville. *See Windle*, 321 F.3d at 663 (discussing sharing joint responsibility with another official as a factor that can create liability for failing to intervene in that official's constitutional violation). In that circumstance, either one of Truitt or Daly could have taken steps to prevent the other's continued inaction—even if limited to warning the other to act. *See Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (noting that a realistic opportunity to intervene may exist when a defendant could have "cautioned" the other state actor to stop).

13

Moreover, the Seventh Circuit "has made clear that the prongs of [the failure-to-intervene] analysis almost always implicate questions of fact." *Id.* After discovery, "[a] more developed factual record might defeat" Jones-Broadway's failure-to-intervene claim, but for now, "the allegations are sufficient to state a claim." *Piercy v. Whiteside County*, No. 14 CV 7398, 2016 WL 1719802, at \*7 (N.D. Ill. Apr. 29, 2016). Accordingly, the IDOC Defendants' motion to dismiss Count II is denied with respect to all the IDOC Defendants, including Daly and Truitt.

### B. Nurse Berzinski

Nurse Berzinski moves to dismiss Count II. In doing so, he argues that Jones-Broadway fails to plead that he had the necessary knowledge of a constitutional violation or the opportunity to intervene. Berzinski also asserts that Jones-Broadway pleads herself out of court by including the allegation that Berzinski was the only Defendant to call 911 for Broadway.

While Berzinski may have a strong case at a later stage, too many facts would benefit from being developed through discovery to permit dismissal based on the pleadings. *See Burks*, 555 F.3d at 594 (noting that lack of detail in allegations of a defendant's knowledge does not justify dismissal). Based on the allegations in the Amended Complaint, Berzinski knew that the other two nurses who came with him to Edward House were not carrying an Emergency Bag. If the failure of the nurses to bring an Emergency Bag was the result of deliberate indifference, which Jones-Broadway has alleged and Defendants have not contested, then the requisite constitutional violation existed. Berzinski, knowing the other two nurses were not carrying the Emergency Bag, plausibly knew of the alleged violation. He also had a plausible opportunity to intervene by telling them to retrieve the life-saving equipment. *Abdullahi*, 423 F.3d at 774. As alleged, he did not do so. Thus, Jones-Broadway has stated a claim for failure to intervene.

14

Similarly, in the briefing, Jones-Broadway asserts that Berzinski only called 911 "eventually," "after significant delay." (Pl.'s Resp. Def. Berzinski's Partial Mot. to Dismiss 7, Dkt. No. 74.) The Amended Complaint does not place Berzinski's actions in such a harsh light, but it is not possible to determine the length of, or rationale for, any delay from the allegations of the Amended Complaint alone. It is certainly plausible that Berzinski wasted precious time before calling 911. And if Berzinski deliberately and unnecessarily delayed calling 911, Jones-Broadway cannot be said to have pleaded herself out of court.

Finally, Berzinski suggests that the failure-to-intervene claim duplicates the deliberate indifference claim in Count I and asserts that Count II should be dismissed on that basis. This is not correct. "To be sure, the claims of deliberate indifference and failure to intervene are closely related." *Wiley v. Young*, No. 21-CV-599, 2022 WL 488144, at *6 (S.D. Ill. Feb. 17, 2022). But they are not identical theories of recovery. *Id.* In any case, Berzinski raises this argument for the first time in his reply brief. Arguments raised for the first time in a reply brief are waived. *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021). Accordingly, Berzinski's motion to dismiss Count II is denied.

### III.    Count III: Conspiracy

Count III of the Amended Complaint alleges that all Individual Defendants engaged in a conspiracy to deprive Broadway of his constitutional rights under the Eighth Amendment and to protect each other from liability for that deprivation. The Court address all Individual Defendants together, as their motions raise the same fundamental arguments against Count III.[3]

---

[3] As with Count II, Wexford again spends a meaningful portion of its motion to dismiss arguing against the conspiracy claim. However, Jones-Broadway only raised the conspiracy claim against the Individual Defendants, not Wexford or the IDOC, so those arguments were unnecessary. Regardless, the arguments raised in Wexford's brief mirror the arguments discussed in the other two motions to dismiss.

"A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) (internal quotation marks omitted). To prove a conspiracy under § 1983, "the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Id.* Of course, at the pleadings stage, the Court is only concerned with the sufficiency of Jones-Broadway's allegations, not whether she can ultimately prove the merits of her case.

The parties disagree about what is required to properly plead a § 1983 conspiracy. Jones-Broadway relies on *Walker v. Thompson* for the proposition that "it is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with." 288 F.3d 1005, 1007 (7th Cir. 2002). But *Walker* was decided years before *Twombly*, 550 U.S. 544, and *Iqbal*, 556 U.S. 662. Its view has since been called into doubt by other courts in this Circuit. *E.g.*, *Roehl v. Merrilees*, No. 11 C 4886, 2012 WL 1192093, at *8 (N.D. Ill. Apr. 10, 2012). The district court decisions that Jones-Broadway cites—all decided after *Twombly*—still rely on *Walker* or similar pre-*Twombly* Seventh Circuit cases. *E.g.*, *Sanchez v. Village of Wheeling*, 447 F. Supp. 3d 693, 705 (N.D. Ill. 2020); *Chatman v. City of Chicago*, No. 14 C 2945, 2015 WL 1090965, at *7 (N.D. Ill. Mar. 10, 2015). For their part, the Individual Defendants point to more recent cases that emphasize the plausibility requirement outlined, with respect to conspiracy specifically, in *Twombly* and more broadly in *Iqbal*. One of those cases, *Cooney v. Rossiter*, notes that even before *Twombly* and *Iqbal*, "conspiracy allegations were often held to a higher standard than other allegations; mere suspicion that persons adverse to the plaintiff had joined a conspiracy against him or her was not enough." 583 F.3d 967, 971 (7th Cir. 2009).

16

Both before and after *Twombly*, a complaint containing "only a bare allegation of conspiracy—not enough to enable [a defendant] to prepare his defense or for the district court to determine whether the claim was within the ballpark of possibly valid conspiracy claims"—was insufficient to state a claim. *Walker*, 288 F.3d at 1008. *Twombly* did not change the federal notice pleading regime. But it did clarify that when allegations of possibly conspiratorial conduct are made, "they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.

"[A]lleging, as it does, a vast, encompassing conspiracy," the Amended Complaint "must meet a high standard of plausibility." *Cooney*, 583 F.3d at 971. It fails to do so. The Amended Complaint does not include any suggestion, beyond one conclusory assertion, that the Individual Defendants reached an agreement, implicit or explicit, about how to respond to Broadway's distress. Rather, the allegations show over a dozen correctional and medical staff members (including the two unnamed nurses) responding, or failing to respond, to Broadway's distress in a range of seemingly uncoordinated ways. The alleged actions of some Defendants (*e.g.*, retrieving ice and beginning chest compressions, retrieving a broken stretcher, Berzinski calling 911) were perhaps slow or inept. But, in context, they do not plausibly suggest that Defendants reached a collective "preceding agreement" to deprive Broadway of medical care. *Twombly*, 550 U.S. at 557.

Moreover, even if the Court were to apply the *Walker* standard, Jones-Broadway does not actually "indicate the parties, general purpose, and approximate date [of the conspiracy], so that the defendant has notice of what he is charged with." *Walker*, 288 F.3d at 1007. As discussed above, Defendants Truitt and Daly were not present at Edward House on the day of Broadway's

death. And Nurse Berzinski arrived at Edward House, along with the two unidentified nurses, after the other Defendants were already on the scene. There is no indication that Truitt, Daly, or Berzinski had an opportunity to reach an agreement with any of the other Defendants regarding Broadway. In her response brief, Jones-Broadway, for the first time, attempts to clarify that she is alleging two separate conspiracies: one involving Daly and Truitt, and another involving all other Individual Defendants who were present for Broadway's medical episode. (Pl.'s Resp. IDOC Defs.' Partial Mot. to Dismiss 10, Dkt. No. 67.) This is an impermissible attempt to modify her pleading, which only alleges one conspiracy joined by all Individual Defendants. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011) ("The effort founders, however, because of the axiomatic rule that a plaintiff may not amend his complaint in his response brief."). Jones-Broadway "fails to allege facts or circumstances upon which either an express or implied agreement between Defendants could be inferred 'above the speculative level.'" *Roehl*, 2012 WL 1192093, at *8 (quoting *Twombly*, 550 U.S. at 555). As a result, the IDOC Defendants' and Berzinski's motions to dismiss Count III are granted.

## IV.    Counts IV and V: ADA and Rehabilitation Act Claims

Counts IV and V of the Amended Complaint are directed solely against the IDOC. They raise, in turn, a claim under Title II of the ADA, 42 U.S.C. § 12132, and a claim under the Rehabilitation Act, 29 U.S.C. § 701. Both statutes prohibit discrimination against "qualified individual[s] with a disability." *McDaniel v. Syed*, 115 F.4th 805, 822 (7th Cir. 2024); 42 U.S.C. § 12132; 29 U.S.C. § 701. And Jones-Broadway alleges that Broadway's asthma was a disability. "The relevant provisions and implementing regulations of the Rehabilitation Act and the ADA are materially identical." *A.H. ex rel. Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587,

592 (7th Cir. 2018) (internal quotation marks omitted). As relevant here, both statutes require prisons to provide reasonable accommodations to a prisoner with a disability. *McDaniel*, 115 F.4th at 823. The IDOC moves to dismiss the ADA claim in Count IV.

The IDOC initially argued that the ADA claim must be dismissed because that statute does not permit compensatory damages and Broadway's death mooted any claim for injunctive relief. However, the claim that compensatory damages are not available under the ADA is inaccurate. *See id.* at 812 ("[Plaintiff's] ADA and Rehabilitation Act claims for compensatory damages survive . . . his death and are still available."). Recognizing its initial argument fails, the IDOC retracted this point in its reply brief.

However, the IDOC further argues that the ADA claim for damages is duplicative of the claim for damages under the Rehabilitation Act. This, the IDOC suggests, should lead the Court to dismiss the ADA claim pursuant to Federal Rule of Civil Procedure 12(f). The IDOC is correct that the "relief available under the ADA and the Rehabilitation Act is coextensive." *McDaniel*, 115 F.4th at 822 (internal quotation marks omitted). But while the Court may strike a redundant pleading under Rule 12(f), that decision is left to the Court's discretion. Fed. R. Civ. P. 12(f). The IDOC does not provide a persuasive explanation for why dismissing Count IV would streamline this case in any meaningful way. Indeed, courts in this Circuit frequently consider ADA and Rehabilitation Act claims at the same time. *See, e.g.*, *McDaniel*, 115 F.4th at 812 (reversing grant of summary judgment for defendant on ADA and Rehabilitation Act claims); *Cesca v. W. Illinois Univ. Bd. of Trs.*, 716 F. Supp. 3d 696, 713 (C.D. Ill. 2024) ("At this early stage, the Court declines to dismiss the ADA claims as legally duplicative of the Rehabilitation Act claims."). Accordingly, at this stage, the Court sees no benefit to dismissing the ADA claim. The IDOC's motion to dismiss Count IV is denied.

19

### V.  Counts VI and VII: Wrongful Death and Survival Claims

Jones-Broadway raises a claim under the Illinois Wrongful Death Act, 740 ILCS 180/1, and a survival action under Illinois state law, 755 ILCS 5/27-6. These state law claims are alleged against all Defendants.

Under the Illinois statute, "[a] wrongful death action allows the decedent's next of kin to recover damages for their own loss based on the wrongful actions of another." *Lawler v. Univ. of Chi. Med. Ctr.*, 104 N.E.3d 1090, 1094 (Ill. 2017). "The cause of action accrues when the death occurs." *Id.* But "the cause of action is the wrongful act, neglect or default causing death, and not merely the death itself." *Id.* (internal quotation marks omitted).

A survival action is distinct from a claim under the Wrongful Death Act. "The Survival Act does not create a statutory cause of action." *Advincula v. United Blood Servs.*, 678 N.E.2d 1009, 1029 (Ill. 1996). Rather, "a Survival Act claim is a derivative action based on injury to the decedent, but brought by the representative of a deceased's estate in that capacity." *Id.* "It merely allows a representative of the decedent to maintain those statutory or common law actions which had already accrued to the decedent before he died." *Id.*

In this case, both claims rely on the same allegedly tortious conduct—to wit, Defendants' neglect of Broadway's medical needs. All Defendants move to dismiss Counts VI and VII. Defendants Wexford and Berzinski argue that the allegations in the Amended Complaint are insufficient to state a claim. The IDOC Defendants argue that the claims are barred by the doctrine of state sovereign immunity.

#### A.  Wexford and Berzinski

Wexford and Berzinski make substantively identical arguments for dismissal, so the Court addresses them together. First, they argue that Jones-Broadway is advancing a theory of

medical negligence to support her wrongful death and survival claims, but that she fails to allege the applicable standard of care and a breach of that standard. Second, they argue that a state law, 735 ILCS 5/2-622, requires a plaintiff alleging medical malpractice to attach an affidavit to her complaint. That affidavit must state that a medical professional, in a written report, has determined that there is "a reasonable and meritorious cause" for the complaint. 735 ILCS 5/2-622(a). Both arguments are unavailing in federal court.

In advancing their first point, the arguments made by Wexford and Berzinski suggest that they are confused as to the applicable pleading standard. Both argue that Jones-Broadway "fails to show how her Complaint comports with Illinois pleading requirements." (Wexford's Reply Supp. Partial Mot. to Dismiss 2, Dkt. No. 57; Berzinski's Reply Supp. Partial Mot. to Dismiss 8, Dkt. No. 79.) They also discuss at length an Illinois case, *Cangemi v. Advocate South Suburban Hospital*, 845 N.E.2d 792, 804 (Ill. App. Ct. 2006), that applies Illinois pleading standards in a medical malpractice case. But Illinois pleading standards do not apply to this case. Contrary to Defendants' argument, the "Federal Rules of Civil Procedure apply to all cases filed in federal court, no matter what the basis of subject matter jurisdiction." *Hefferman*, 467 F.3d at 599. "Unlike Illinois law, under the federal pleading standards, Plaintiff does not have to plead facts to 'satisfy each element of a claim.'" *Dangerfield v. Wexford Health Sources Inc.*, No. 23-CV-03687, 2024 WL 2873809, at *6 (S.D. Ill. June 7, 2024) (quoting *Hefferman*, 467 F.3d at 599). Nor must a plaintiff plead legal theories, so long as the complaint provides a defendant with fair notice. *Hefferman*, 467 F.3d at 600.

Under the Federal Rules, Jones-Broadway has provided sufficient factual allegations to state a claim for medical negligence in furtherance of her wrongful death and survival actions. Jones-Broadway alleges that Wexford and Berzinski are healthcare providers who were

21

responsible for the medical care received by men incarcerated at Stateville and that they participated in Broadway's care. Those allegations are sufficient to establish that Wexford and Berzinski both owed a duty of reasonable care to Broadway as a patient. *See Dangerfield*, 2024 WL 2873809, at *7 (holding similar allegations sufficient to show a duty of care existed between Wexford employees and a prisoner). "The specific standard of care, and whether that standard was breached, is a fact question to be resolved at a later stage." *Sonntag v. Cook County*, No. 21 C 4935, 2022 WL 704833, at *5 (N.D. Ill. Mar. 9, 2022). The Amended Complaint provides Wexford and Berzinski with fair notice of a medical negligence claim. Thus, the Court cannot dismiss Counts VI and VII based on the grounds that the allegations in the Amended Complaint are insufficient.

Turning to Wexford and Berzinski's second argument, they correctly identify the affidavit requirement under Illinois medical malpractice law. "This requirement [also] applies to malpractice litigation in federal court because § 5/2-622 is a substantive condition of liability." *Young v. United States*, 942 F.3d 349, 350 (7th Cir. 2019). Still, although an affidavit must be submitted at some point before summary judgment, the Seventh Circuit in *Young* was clear that the affidavit does not need to be attached to a complaint filed in federal court. *Id.* at 351–52.

Wexford and Berzinski attempt to distinguish *Young*, which concerned a *pro se* prisoner litigant, from the present case where Jones-Broadway is represented by counsel. And while *Young* does discuss the barriers prisoners or *pro se* plaintiffs face in obtaining the required affidavit, the case does not turn on their unrepresented status. Rather, *Young* concludes unequivocally "that a complaint in federal court cannot properly be dismissed because it lacks an affidavit and report under § 5/2-622." *Id.* at 351. That conclusion is grounded in Rule 8 of the Federal Rules, not the status of the plaintiff. *Id.* ("Section 5/2-622 applies in federal court to the

extent that it is a rule of **substance**; but to the extent that it is a rule of **procedure** it gives way to Rule 8 and other doctrines that determine how litigation proceeds in a federal tribunal."). This Court must follow the Federal Rules and the direction of the Seventh Circuit. "Rule 8 of the Federal Rules of Civil Procedure specifies what a complaint must contain. It does not require attachments." *Id.* Accordingly, the lack of an affidavit at this stage does not provide a basis to dismiss either of Jones-Broadway's state law claims. Wexford and Brezinski's motions to dismiss Counts VI and VII are denied.

### B.      The IDOC Defendants

The IDOC Defendants argue that the state law counts must be dismissed as to them under the doctrine of state sovereign immunity.[4] The IDOC Defendants initially argued that Illinois law prohibits a federal court from exercising subject-matter jurisdiction over state law claims against them. This argument may have won the day in an earlier era. *Woods v. Cook County*, No. 13 C 2607, 2014 WL 340422, at *3 (N.D. Ill. Jan. 30, 2014) ("Until recently, our Court of Appeals construed the Court of Claims Act to limit federal subject-matter jurisdiction."). But more recent cases have established that a federal court may exercise supplemental jurisdiction over state law claims against state employees. *See, e.g.*, *Fields v. Wharrie*, 672 F.3d 505, 518 (7th Cir. 2012) ("Our recent decision in *Rodriguez v. Cook County*, [664 F.3d 627, 630–32 (7th Cir. 2011)] makes clear that a state employee's sovereign-immunity defense does not impact a federal

---

[4] In addition to the state sovereign immunity argument, the IDOC Defendants mention qualified immunity in the section heading of their motion to dismiss. They do not mention or discuss that defense at any other point, however. The argument is thus waived. *United States v. Collins*, 796 F.3d 829, 836 (7th Cir. 2015). The IDOC Defendants also initially raised the argument that Count VII is not a standalone claim and must be dismissed. Because they retract this misguided argument in their reply brief, the Court does not discuss it here.

court's jurisdiction over a case."). Accordingly, the IDOC Defendants have withdrawn their jurisdictional argument.

Still, the IDOC Defendants argue that they are entitled to state sovereign immunity and that the state law claims against them should be dismissed without prejudice to being brought again in the Illinois Court of Claims. The Court agrees.

Under the State Lawsuit Immunity Act, the State of Illinois is immune from suit, except in the Illinois Court of Claims. *T. S. v. County of Cook*, 67 F.4th 884, 891 (7th Cir. 2023). And state sovereign immunity cannot be circumvented by making an action nominally against a state employee "when the real claim is against the State of Illinois itself and when the State of Illinois is the party vitally interested." *Id.* (internal quotation marks omitted). To determine whether an action against a state employee is really one against the State of Illinois, courts apply the factors outlined in *Healy v. Vaupel*, 549 N.E.2d 1240, 1247 (Ill. 1990). Under *Healy*, an "action is one against the State" when

> there are (1) no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) where the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State.

*Id.* (internal quotation marks omitted). Here, the Court need not analyze each of these factors because Jones-Broadway concedes that they apply and that her claims against the IDOC Defendants are properly considered claims against the State of Illinois.

Instead of contesting the *Healy* factors, Jones-Broadway argues that this case falls into an exception to state sovereign immunity. Relying on the Seventh Circuit's decision in *Murphy v. Smith*, she argues that "[i]f [a] plaintiff alleges that state officials or employees violated statutory or constitutional law, [s]overeign immunity affords no protection." 844 F.3d 653, 658–59 (7th Cir. 2016), *aff'd*, 583 U.S. 220 (2018) (internal quotation marks omitted). In turn, *Murphy* relied

24

in part on the Illinois Supreme Court's decision in *Leetaru v. Board of Trustees of University of Illinois*, 32 N.E.3d 583 (Ill. 2015), which "reaffirmed the exception in broad terms." *Murphy*, 844 F.3d at 659. Here, the Amended Complaint alleges that the IDOC Defendants violated the Eighth Amendment and multiple federal and state laws. Thus, she contends that sovereign immunity does not apply to them.

Jones-Broadway's reliance on *Murphy* is misplaced, however, as the Seventh Circuit explained more recently in *T. S.* In that case, the Seventh Circuit made clear that the exception Jones-Broadway invokes, which it terms the "officer suit exception," "applies when a plaintiff seeks to enjoin state officials from ongoing statutory or constitutional violations." *T. S.*, 67 F.4th at 894. *Leetaru*, relied on by the panel in *Murphy*, involved a defendant who sought to enjoin the future conduct of state actors. *Leetaru*, 32 N.E.3d at 585. Significantly, the Seventh Circuit, also considering *Leetaru*, found that "the officer suit exception does not apply in a damages suit." *T. S.*, 67 F.4th at 894. The Seventh Circuit explained that *Murphy* provided "an accurate statement of the officer suit exception" but that, in interpreting *Leetaru*, the panel "did not discuss the injunctive nature of the relief sought in *Leetaru* or the fact that *Leetaru* involved an official capacity suit." *Id.* Moreover, contrary to Jones-Broadway's assertion, the *T. S.* panel relied on the Illinois Supreme Court's intervening state law decision in *Parmar v. Madigan*, 106 N.E.3d 1004 (Ill. 2018). In *Parmar*, the Illinois Supreme Court explained the distinction between suits against government employees in their official capacity seeking to enjoin future conduct, and damages actions against employees in their personal capacity. The Illinois Supreme Court concluded: "*Leetaru* makes plain that a complaint seeking damages for a past wrong does not fall within the officer suit exception to sovereign immunity." *Id.* at 1010.

25

The present case involves claims against the IDOC Defendants in their personal capacities and seeks damages for past harm suffered by Broadway and Jones-Broadway. Jones-Broadway does not seek to enjoin future unlawful conduct. Following the direction of *T. S.* and *Parmar*, the Seventh Circuit's and Illinois Supreme Court's more recent holdings on this topic, this Court concludes that the officer suit exception to sovereign immunity does not apply. Thus, "the *Healy* factors should . . . be[] applied in this personal capacity suit for damages." *T. S.*, 67 F.4th at 895. Because Jones-Broadway concedes that her claims satisfy the *Healy* factors, the Court concludes that her state law claims are against the State of Illinois and barred by the doctrine of state sovereign immunity. Accordingly, the Court grants the IDOC Defendants' motion to dismiss Counts VI and VII.

## VI. Count VIII: Respondeat Superior

Jones-Broadway raises a claim for *respondeat superior* against Wexford, alleging that Wexford is vicariously liable for the actions of Berzinski acting within the scope of his employment.

To the extent Jones-Broadway seeks to hold Wexford vicariously liable for constitutional violations under § 1983, Circuit precedent is clear. That theory of liability is not available for § 1983 claims against a private corporation. *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) ("[A] private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights."); *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014) ("The answer under controlling precedents of this court is clear. Such a private corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. *Respondeat superior*

liability does not apply to private corporations under § 1983."). The Court declines Jones-Broadway's invitation to depart from clearly established precedent.

Turning to Jones-Broadway's state law claims, Wexford is correct that *respondeat superior* is not a standalone claim or cause of action. *Armbruster v. Wexford Health Sources, Inc.*, No. 16-CV-0544, 2017 WL 2619032, at *3 (S.D. Ill. June 16, 2017) ("[R]*espondeat superior*, in and of itself, is not a separate claim, but merely a theory of recovery."). But that does not prevent Jones-Broadway from proceeding on a theory of vicarious liability with respect to her state law claims. *Id.*; *see also White v. Watson*, No. 16-CV-560, 2018 WL 2047934, at *15 (S.D. Ill. May 2, 2018) ("Claims seeking to hold a principal liable under the Wrongful Death Act for its agent's acts under a *respondeat superior* theory are permitted and are, in fact, common.").

The Court notes again that, contrary to Wexford's mistaken argument based on Illinois pleading standards, plaintiffs in federal court are not required to plead legal theories. *Hefferman*, 467 F.3d at 600. Jones-Broadway may pursue her state law claims in Counts VI and VII under a theory of vicarious liability for Berzinski's negligence, a theory of institutional negligence, or both. As discussed above, her allegations are sufficient to put Wexford on notice for either theory. Accordingly, while the Court grants Wexford's motion to dismiss Count VIII as a standalone claim, Jones-Broadway is free to proceed on a *respondeat superior* theory for her state law wrongful death and survival claims.

### VII.    Punitive Damages

Finally, Wexford and Berzinski argue that Jones-Broadway is improperly requesting punitive damages, which are unavailable for her state law claims.

The Amended Complaint includes a request for punitive damages in its general prayer for relief. That request is not tied to any particular claim. Wexford and Berzinski are correct that

Illinois law prohibits courts from awarding punitive damages in cases of medical or hospital malpractice. *Bernier v. Burris*, 497 N.E.2d 763, 776 (Ill. 1986). And here, there is no dispute that Jones-Broadway's state law claims are premised on medical negligence. Accordingly, punitive damages are not available for those claims. However, "[p]unitive damages are recoverable in § 1983 actions where the defendant had a reckless or callous disregard to the federally protected rights of others." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 930 (7th Cir. 2004); *see also Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) (discussing availability of punitive damages under § 1983); *Hill v. Shelander*, 924 F.2d 1370, 1374 (7th Cir. 1991) (same). To be clear, Jones-Broadway may not recover punitive damages under either of her state law claims. But because punitive damages are available for Jones-Broadway's constitutional claims the Court sees no reason to strike her request for punitive damages.

## CONCLUSION

For the reasons stated above, Wexford's motion to dismiss (Dkt. No. 17) is denied as to Counts II, III, VI, and VII. The motion is granted as to Count VIII. In addition, the IDOC and the Individual Defendants' motion to dismiss (Dkt. No. 52) is denied as to Counts I, II and IV. The motion is granted as to Counts III, VI, and VII. The state law claims in Counts VI and VII are dismissed without prejudice to renewal in the appropriate state court. And finally, Berzinski's motion to dismiss (Dkt. No. 60) is denied as to Counts II, VI, and VII. His motion is granted as to Count III.

ENTERED:

Dated:  March 25, 2026

_____

Andrea R. Wood
United States District Judge

28